IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PAUL F. CARUANA, et al.                  )
                                          )
v.                                        )      No. 3:01-1567
                                          )      Judge Sharp/Bryant
DAN J. MARCUM, et al.                     )


To:     The Honorable Kevin H. Sharp, District Judge


REPORT AND RECOMMENDATION

        This civil action was transferred to the docket of Judge Sharp by order entered

June 1, 2011 (Docket Entry No. 385)

        Currently pending in this case are motions for summary judgment by

defendants Marcum, Hyde, Bass, Lester, Poston, and Tennessee Motors, Inc. ("TMI") (Docket

Entry No. 317), and by defendant Ray (Docket Entry No. 320).  For the reasons given below,

the undersigned recommends that the motion of defendants Marcum, Hyde, Bass, Lester,

Poston, and TMI be GRANTED IN PART and DENIED IN PART, and that the motion of

defendant Ray be DENIED.


I.  STATEMENT OF THE CASE

        This case is nearly ten years old.  During most of that time, the case has been

vigorously litigated, including on successful interlocutory appeal to the Sixth Circuit.  As

originally pled, the case involved various federal statutory causes of action, and multiple

pendent state law claims.  All federal claims have since been dismissed, leaving only plaintiff

Caruana's state law claims against defendants Marcum, Hyde, Bass, Lester, Poston, TMI, and

Ray. While Ray has argued that the state law claims against him should be dismissed upon

this Court's proper declination to continue its exercise of supplemental jurisdiction following

the dismissal of all federal claims from the case, citing 28 U.S.C. § 1367(c)(3) and Musson

Theatrical, Inc. v. Fed. Express. Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996), the undersigned

finds that, considering the long pendency of this case, the substantial time and resources that

have already been devoted to it by all involved, and the additional delay that would attend

its resolution in a new forum, the continued exercise of supplemental jurisdiction over the

remaining state law claims is proper. See Fossyl v. Milligan, 317 Fed. Appx. 467, 473 (6th Cir.

Mar. 18, 2009), and cases cited therein.


## II. BACKGROUND

The following, relatively brief factual synopsis is largely culled from plaintiff's

response to defendant Ray's Statement of Undisputed Facts (Docket Entry No. 338).

From July 1993 to March 2001, plaintiff Paul Caruana was the owner-operator

and record owner of 100% of TMI, a General Motors ("GM") dealership based in Shelbyville,

Tennessee, and incorporated under the laws of Tennessee, doing business as "Southern GM."

Sometime in November 1999, General Motors Acceptance Corporation ("GMAC"), the

provider of floor plan financing for TMI, made a demand upon TMI for an infusion into the

corporation of $275,000.00 of unencumbered capital. Such demand was in response to an

incident in September 1998 when Caruana discovered alleged misappropriation of corporate

funds, erasure of computer data and destruction or theft of manual ledgers by TMI's

comptroller, Gloria Holding. As a result of this September 1998 incident, TMI was in severe

financial difficulty and was "out of trust" with GMAC in the amount of approximately

$450,000.00. At the time GMAC made its demand for additional capital, TMI was already indebted to GMAC for $250,000.00, secured by a tract of land personally owned by Caruana with an appraised value of $488,000.00. Caruana could not personally make the infusion of capital demanded by GMAC, so he began to seek out potential purchasers or investors.

Defendants Marcum and Lester, introduced to Caruana by his attorney, defendant Ray (who also had represented Marcum in the past) were approached as potential investors in TMI. At that time, in approximately January 2000, Marcum and Lester were not interested in investing in TMI.

Caruana continued his search for investors or purchasers, which led to an agreement with Gene Caldwell for the sale of TMI, along with certain real estate. Pursuant to that agreement, Caldwell was to assume all the liabilities of TMI and make an initial, $275,000.00 capital infusion into TMI in exchange for operating control and a 50% interest in TMI. Additionally, by the end of 2001, Caldwell was to pay Caruana $750,000.00 for the remaining stock in TMI and $560,000.00 for the real estate, essentially buying out Caruana's interest in TMI and the real estate. GMAC approved Caldwell as a purchaser of TMI and had Caldwell and his wife execute a guarantee for a floor plan financing arrangement for TMI. Caldwell brought defendant Poston into TMI, and put Poston in position as acting general manager of the corporation.

In late April or early May 2000, two of Caldwell's checks for the initial capital infusion into TMI were not honored upon presentment. Caldwell requested additional time to come up with the money. Meanwhile, GMAC continued to insist upon the immediate infusion of capital into TMI, and threatened to pull TMI's credit line if the infusion did not occur, which would have forced TMI out of business. Caruana was concerned about

Caldwell's ability to complete the transaction in time to prevent GMAC from pulling TMI's credit line. Caldwell subsequently brought Caruana a cashier's check for $175,000.00. However, by this time Marcum had indicated that he was now interested in investing in TMI, and Caruana decided, upon consulting with Ray, to terminate the deal with Caldwell and proceed to attempt to strike a deal with Marcum.

At a meeting between Caruana and Marcum, Ray reminded them about the potential conflict of interest caused by his representation of TMI and his history of representing both Caruana and Marcum individually. Neither Marcum nor Caruana made any objection to Ray's role going forward. With Caruana's permission, Ray related to Marcum the history of the Caldwell deal. On a handshake, Marcum agreed to invest in TMI and immediately made a capital infusion of $175,000.00, and also committed to invest an additional $100,000.00 into TMI at a later time. Thereafter, Caruana wrote a note to Caldwell confirming his rejection of Caldwell's tender of $175,000.00, and proceeded to accept Marcum's check in that amount. Caruana and Marcum proceeded to negotiate the terms of Marcum's investment. While Caruana attempted to negotiate Poston's removal from employment at TMI, Marcum insisted that Poston not be discharged.

When Marcum and Caruana concluded their negotiations, Ray reduced their agreement to a writing entitled "Stock Option Purchase Agreement," dated June 30, 2000, and executed by the parties on August 3, 2000. Under this agreement, Marcum received an option to purchase 50% of Caruana's stock in TMI, while Caruana retained 50% ownership and management control of the dealership. Around December 2000, Marcum and Caruana amended their original agreement to reflect additional capital invested by Marcum to keep TMI in business, with the intent to bring in additional investors to TMI. The amended

4

agreement recited that Marcum would underwrite an additional capital injection into TMI, which would take the form of an equity injection achieved by the issuance of additional common stock. This issuance of additional stock was to dilute Caruana's 50% ownership interest, while other terms of the amended agreement included the establishment of an employee stock option plan, the negotiation of an employment agreement for the President/CEO, reasonable efforts to limit or eliminate Caruana's personal liability on TMI loans, an agreement to seek a buyer for real estate, and an agreement to seek a buyer for TMI within the next six to twenty-six months.

A private placement memorandum ("PPM") was then prepared to outline the terms of the offer of TMI stock and the eligibility of investors to purchase said stock, which was adopted on or about January 31, 2001. Ray prepared the PPM from another such memorandum that Marcum had supplied. Also on January 31, 2001, Caruana signed an agreement promising to execute all documents needed to effectuate the offering. Over the course of February 2001, TMI/Southern GM received checks and subscription agreements from defendants Marcum, Hyde, Bass, and Lester, who became part owners of the dealership and, in some cases, became members of the Board of Directors. The PPM disclosed Ray's potential investment in TMI, and he did in fact invest $10,000.00 in return for 1.47% of the corporation's stock. Ray has never been an officer or director, or otherwise participated in the management of TMI. The investors became stockowners upon providing TMI with a check and subscription agreement. The investment checks were deposited into an escrow account as contemplated by the PPM, and the only thing delaying the issuance of stock certificates after the monies were received was GM's approval of the new investors.

On February 6, 2001, an independent auditor was engaged to review the books

of TMI.  Mr. Rush Bricken of Housholder, Artman & Associates performed the audit and reported the results to Marcum in letters dated March 15 and 22, 2001.  At around the same time, GM's approval of the new investors was secured after Caruana, at Ray's behest, executed and submitted certain paperwork required for that purpose.  Thereafter, the investment capital was released from escrow in the form of checks written by Marcum.  Following the release of these monies and the issuance of certificates to all stockholders, on March 29, 2001, Marcum and other members of the Audit Committee (of which Ray was not a member) recommended that Caruana be relieved of his duties.  That same day, the Executive Committee and the Board of Directors accepted the Audit Committee's recommendation, and Caruana was informed of this action and removed from the dealership premises by armed off-duty police officers.  Caruana continued to receive a paycheck from TMI through the end of June 2001.  After March 29, 2001, Caruana was represented by attorneys John Rogers and Robert Marlow.  Following his termination, Caruana remained a TMI shareholder.

## III.  CONCLUSIONS OF LAW

### A.  Summary Judgment Standard

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that summary judgment should be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In determining whether the movant has met its burden, the court must view the evidence in the light most favorable to the non-moving party.  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1356

(1986).  In order to defeat the motion, the non-moving party may not merely rest on

conclusory allegations contained in the complaint, <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548,

2553 (1986), but must affirmatively demonstrate "sufficient evidence favoring the non-

moving party for a jury to return a verdict for that party."  <u>Anderson v. Liberty Lobby, Inc.</u>,

106 S.Ct. 2505, 2511 (1986).


    B.  <u>Motion of Defendants Marcum, Hyde, Bass, Lester, Poston, and TMI (hereinafter</u>

<u>collectively referred to as "the Southern GM defendants)</u>

       In their motion (Docket Entry No. 317), the Southern GM defendants seek

summary judgment on all of Caruana's claims against them, which include alleged fraud,

defamation, false light invasion of privacy, breach of fiduciary duty, and conspiracy/concert

of action.  Additionally, summary judgment is sought on Caruana's claims, solely against

defendant TMI, of failure to deliver personal property and failure to indemnify, and his

claim against TMI and Marcum for breach of contract.  Finally, the Southern GM defendants

seek judgment on any claim asserted by plaintiff Fitch, as there is no particular mention in

plaintiffs' revised amended complaint (Docket Entry No. 104) of any alleged harm or

resulting liability specific to her.

       1.  Fraud and Conspiracy/Concert of Action

       In Caruana's revised amended complaint, the Southern GM defendants and

defendant Ray are charged with perpetrating a fraudulent scheme upon Caruana by conduct

including:  "representing that Caruana would manage the affairs of TMI when, in fact, they

planned to and did remove Caruana as an officer and employee of the company; creating

Caruana's incapacity to act as the GM dealer-operator for TMI; failing to inform Caruana of

the participation of Ray as a purchaser of TMI's stock during the period during which he was drafting documents reflecting the terms under which the purchase and sale would occur until the [PPM] disclosed such fact; inducing Caruana to transfer half of his interest in the Real Estate to TMI without consideration; and misrepresenting their intentions with respect to his participation in and compensation from TMI and his stock interest in TMI." (Docket Entry No. 104 at ¶ 123) It is further alleged that defendants Marcum, Ray, Hyde, Bass, and Lester defrauded plaintiff by making "statements that Caruana would continue to manage the operations of TMI after he ceased to be the majority shareholder when in fact they were planning to (and admitted to others that they were planning to) remove him as an employee of the company as soon after the change in control of the stock of the Corporation as possible." (Id. at ¶ 127) The individuals among the Southern GM defendants are further charged with conspiring against Caruana to execute their fraudulent scheme. (Id. at ¶¶ 209-229) Caruana alleges that he executed the paperwork demonstrating his minority shareholder position to GM in reliance upon defendants' representations related to his continued management of the dealership.

The following undisputed facts frame the fraud and conspiracy claims asserted here: After executing their agreement to the infusion of Marcum's capital and his right to purchase 100 shares of TMI stock at his option ("Marcum I," dated June 30, 2000 and executed August 3, 2000), Caruana and Marcum subsequently agreed to an additional infusion of money by Marcum, this time an equity injection that was to be accompanied by the issuance of additional common stock in TMI ("Marcum II," dated December 21, 2000). Under the terms of this agreement, Marcum was to exercise his option to purchase 100 shares of TMI stock, which would make him 50% owner of the corporation's common stock,

and the issuance of additional stock was to reduce Caruana's ownership interest to approximately 37.5% of TMI's common stock, with the remaining approximate 62.5% interest to be owned by Marcum and other investors. Finally, on January 31, 2001, Caruana and Marcum approved the terms of a Private Placement Memorandum ("PPM") which embodied their proposal for recapitalizing TMI: the redemption of all 100 existing shares of TMI stock, owned by Caruana, so as to make the larger stock offering to qualified investors. After the redemption of Caruana's shares and the reissue of TMI stock at full subscription, the PPM called for Caruana to receive 2150 of the 6800 issued shares, representing 31.6176% of TMI's stock. Marcum I calls for Caruana's retention as manager of the dealership for at least one year, and recognizes the parties' intent to negotiate a long-term employment agreement which would ensure that he continued thereafter in that role. Marcum II requires Marcum, Caruana and TMI to negotiate a severance package for the TMI "President/CEO, to include 12 months salary for severance resulting from a change of ownership." The PPM recognizes the corporate intent to negotiate an employment agreement with Caruana, to keep him in charge of the overall operation of the company. (Docket Entry No. 104, Exh. E at 12) After a short period of time following the approval of the PPM, Caruana submitted certain paperwork to GM at Ray's behest, in order to gain GM's approval of the subscribed investors and effectuate the private placement of TMI stock with them. Shortly thereafter, on March 29, 2001, Caruana was informed that he had been relieved of his duties by vote of the board of directors, and was escorted from the dealership premises by an armed guard.

Under Tennessee law,

Actions for fraud contain four elements: (1) an intentional misrepresentation

of a material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation. The fourth element requires that the misrepresentation involve a past or existing fact or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform.

Dobbs v. Guenther, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992) (citing cases). In their motion, the Southern GM defendants argue that Caruana only offers his own "vague suspicions," "subjective belief," and "unproven notions" in support of his claim of defendants' fraudulent intent to deceive with their representation – made without the contemporaneous intent to perform – that he would continue to manage Southern GM for at least one year. (Docket Entry No. 318 at 5) In the statement of facts section of their brief, the Southern GM defendants offer Caruana's deposition testimony as support for the following facts which controvert the allegations of the revised amended complaint:

On March 13, 2001, an $88,067.37 TMI check delivered to GMAC was returned for insufficient funds. The new Board of Directors of TMI commissioned a financial audit of the dealership which was agreed to by Caruana. Based upon the recommendations and findings of the auditors, the Board concluded that Caruana had misappropriated corporate funds. The net result of the audit was the termination of Diana Fitch's employment and the suspension of Caruana's employment with TMI on March 29, 2001.

(Id. at 3) Then, in their summary judgment reply brief (Docket Entry No. 362 at 3), the Southern GM defendants identify Caruana's failure to cite evidence in support of his disputation of facts *offered by defendant Ray* in support of his summary judgment motion, as support for their argument that there is no triable issue regarding the facts leading to Caruana's dismissal. Plainly, however, in his response to the statement of undisputed facts offered by the Southern GM defendants in support of their own motion, Caruana has proffered the deposition testimony of Rush Bricken and Glynda Gayndy in refuting the

notion that he had misappropriated corporate funds and been relieved of his duties in response to such financial malfeasance.  (Docket Entry No. 336 at 5, 10)  Mr. Bricken, the CPA who conducted the review of TMI's books, testified to accounting irregularities on those books, but not to evidence of what he would consider misappropriation of funds or a large-scale overstatement of the company's balance sheet.  (Docket Entry No. 337 at 30, 39, 42, 46-47, 50-51, 52)  Ms. Gayndy testified that at some time around the 2000 Thanksgiving holiday she was in a job interview with Poston and Caruana when, after Caruana left the room, the following exchange took place:  "[A]t that point, [Poston] said I really want you to come to work here and I wouldn't ask you to come to work here if I didn't know Mr. Caruana wouldn't be gone.  And I said what do you mean by gone.  He said his investors are taking over the dealership."  (Docket Entry No. 272-5 at 3)  Finally, Marcum testified that the revelation of Caruana's alleged embezzlement of corporate funds[1] was "the straw that broke the camel's back," but that at least as important to the decision to suspend and then terminate his employment were issues with Caruana's competence as a budgetary and personnel manager which were revealed in the months leading up to his suspension.

(Docket Entry No. 321-11 at 46-48)

        Viewing this evidence and any inferences to be drawn therefrom in the light

---

[1]Marcum testified that Caruana's misappropriation of funds had been suspected, and was first confirmed to him on March 27-28, 2001, when checks made to Caruana by a warranty insurance company were determined to be "kickbacks" which should have benefitted the corporation.  (Docket Entry No. 321-11 at 47-48, 53)  Caruana testified in an affidavit that such payments are incentives for insurance products that are sold at dealerships including Southern GM/TMI, and that:  "Incentives are paid to the dealer, people who sell the products in the finance office, and the largest recipient of the incentives is the dealership itself.  This was true with respect to sales incentives awarded by JM & A Group relating to sales of their products at Southern GM.  The dealership, finance personnel, and the dealer [Caruana] received incentives from JM & A Group for selling their products.  TMI was by far the largest beneficiary of these incentive payments."  (Docket Entry No. 349 at 3, ¶ 8)

most favorable to Caruana, the undersigned finds that it creates a genuine issue of material fact as to whether Caruana's ouster had been predetermined by the defendants who came to comprise the investment group prior to their subscription of TMI stock, such that the approval and effectuation of the PPM in 2001 included the material misrepresentation that, pursuant to the incorporated terms of the Marcum agreements, Caruana would be retained with a management contract and a negotiated severance package, when defendants had no intent to fulfill those promises which induced Caruana to further reduce his ownership interest in TMI.

Likewise, there is a genuine issue of material fact as to whether defendants engaged in a conspiracy to defraud, which is defined as a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." Brown v. Birman Managed Care, Inc., 42 S.W.3d 62, 67 (Tenn. 2001) (quoting Chenault v. Walker, 36 S.W.3d 45 (Tenn. 2001)). The elements of this tort are common design, concert of action, an overt act, and resulting damages. Braswell v. Carothers, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993). Defendants merely argue that without a viable claim of underlying fraud, there can be no conspiracy to defraud. However, inasmuch as the fraud claim must be tried to a jury, so must the conspiracy claim, as well as the claimed concert of action, a separate tort under which liability for "serious civil injury" may be established even where the tortfeasor only renders substantial assistance or encouragement to another known to the tortfeasor to be breaching a duty to the plaintiff. See Bryant v. McCord, 1999 WL 10085, at *12 (Tenn. Ct. App. Jan. 12, 1999) (quoting Huckeby v. Spangler, 521 S.W.2d 568, 573 (Tenn. 1975), and Restatement (Second) of Torts § 876(c)).

2.  Defamation and False Light Invasion of Privacy

In his revised amended complaint, Caruana pleads claims of defamation and false light invasion of privacy, both supported by the allegations that Marcum, TMI, Hyde and Poston "have stated or implied in statements made to third parties that Caruana has been false, deceptive, or dishonest, and that he has been incompetent in his business activities, and Marcum has stated or implied that Caruana was formerly incarcerated in prison ... [and] these defendants, and/or their agents, have told third parties that Caruana is no longer part of the dealership (TMI) and has moved out of the state of Tennessee[.]" (Docket Entry No. 104 at ¶¶ 136-37, 146-48) These allegations appear to relate to oral as opposed to written statements – as apparently confirmed during Caruana's deposition (Docket Entry No. 318-6 at 19-20) -- and therefore invoke the law of slander. To be actionable, both slander and false light invasion of privacy require that the harmful statement be published, to a third party in the case of slander and to the public at large in the case of invasion of privacy. <u>Sullivan v. Baptist Mem. Hosp.</u>, 995 S.W.2d 569, 571 (Tenn. 1999); <u>West v. Media General Convergence, Inc.</u>, 53 S.W.3d 640, 643-44 (Tenn. 2001). Under either theory, the statute of limitations is six months from the date of utterance of the harmful statement. Tenn. Code Ann. § 28-3-103; <u>see</u> <u>West</u>, 53 S.W.3d at 648 (statute of limitations for false light is the same as for defamation). Caruana's failure to plead the time and place of the alleged slanderous statements was not fatal to these claims upon this Court's ruling on defendants' motion to dismiss, because federal pleading rules do not require such specificity; rather, the details important to the limitations defense are expected to be readily available through discovery. (Docket Entry No. 102 at 31-32) However, as the Southern GM defendants point out, after nearly ten years of litigation, Caruana still fails to specify when or where the alleged

slanderous utterances were made to any third parties. While Caruana, in his response to the pending summary judgment motion, points to statements which must have been made at the June 30, 2001 meeting of the Board of Directors where it was decided that he should be suspended or terminated, it is clear that such statements among agents of the same corporation at a duly organized Board meeting cannot be considered published to a third party, as required to sustain the claims at bar. E.g., Woods v. Helmi, 758 S.W.2d 219, 223 (Tenn. Ct. App. 1988).

In the absence of any showing of injurious statements made to any third party within six months of the December 2001 filing of plaintiff's original complaint, the statute of limitations must now be deemed to bar any recovery for such statements under either a defamation or false light theory.

Also in his response to the pending summary judgment motion, Caruana argues that both his defamation and false light claims are based upon written statements included in a June 6, 2001 letter from defendant Ray (as an agent of TMI, presumably, since these claims have long been dismissed as against Ray personally) to Mr. Robert Marlow, Caruana's attorney at the time, and an attached record of journal entries allegedly prepared by defendant Marcum. However, in addition to being improperly offered for the first time in a response brief years after the filing of the revised amended complaint, such written correspondence with the attorney for the person allegedly defamed has long been held to not constitute publication of the matter for purposes of a defamation claim. Freeman v. Dayton Scale Co., 19 S.W.2d 255257 (Tenn. 1929) ("The essence of publication being the giving out to the public of the matter, it would seem clear that, when one goes no further than to communicate the matter to the confidential attorney of another, he has not been guilty of

doing that which might reasonably be expected to give the matter circulation."). Nor could a single letter sent to one individual ever constitute publicity for purposes of a false light claim. <u>Secured Fin. Solutions, LLC v. Winer</u>, 2010 WL 334644, at *4 (Tenn. Ct. App. Jan. 28, 2010); <u>L-S Indus., Inc. v. Matlack</u>, 641 F.Supp.2d 680, 687-88 (E.D. Tenn. 2009).

Accordingly, the undersigned finds that no genuine issues of material fact exist with regard to Caruana's defamation and false light claims, and concludes that summary judgment should enter in defendants' favor on these claims.

### 3. Breach of Contract/Breach of Fiduciary Duty

Defendants Marcum and TMI argue that they are not liable for any of the multiple contractual breaches alleged in Caruana's revised amended complaint (Docket Entry No. 104 at ¶ 157(A)-(K)) because of Caruana's own breach of the representations and warranties in Marcum I pertaining to TMI's financial condition. As pertinent to this argument, those representations and warranties (which carried forward through the renditions of the agreement between these parties) included the following provisions: "The financial records and corporate documents furnished to Marcum are true and correct and fairly represent the financial condition of [TMI];" further, Caruana personally assured the truth and correctness of the documents furnished to Marcum. (Docket Entry No. 104, Exh. C, ¶¶ 4.07, 4.13) Marcum and TMI argue that Caruana's alleged erroneous or fraudulent representation of TMI's financial condition at the time that Marcum I was executed nullified their own contractual obligations undertaken in that agreement, and therefore acts as a bar to his claim for breach of contract. Defendants cite no authority for this proposition.

In response to this argument, Caruana asserts that the audit report which is argued to have revealed his alleged financial misdeeds was not viewed in that light by the

auditor himself, as revealed in Mr. Bricken's deposition testimony.  (Docket Entry No. 335 at 9)  In reply, Marcum and TMI assert that Mr. Bricken identified a number of accounting improprieties on the books of TMI, including the "rat hole" account which Caruana improperly maintained.  (Docket Entry No. 362 at 5)  However, Marcum testified at his deposition that he was aware of the rat hole account prior to signing Marcum II in December 2000, and proceeded to sign that agreement because he still felt that his investment in the company was a good one, and that the company just needed better cash controls in place.  (Docket Entry No. 321-11 at 28)  Moreover, Marcum testified that, after having received the audit results dated March 15 and 22, 2001, he went ahead and released the investment proceeds to TMI from the escrow account on March 28th or 29th, which in turn effectuated Caruana's surrender of his 100% stock ownership certificate, so that his new certificate for 2150 shares of reissued TMI stock, as well as the other investors' stock certificates, might be delivered from escrow.  (Docket Entry No. 321-12 at 8, 13, 37-38)  He further testified that Caruana's alleged breach of the representation related to TMI's financial condition had no impact on Marcum's contractual obligations to the other investors, but merely constituted "issues of reps and warrants" and balance sheet issues the likes of which Caruana had previously corrected and made good on.  (Id. at 37, 40)  He specifically testified that the decisions that were made regarding Caruana's continued employment, and related matters upon which Caruana's breach of contract claim is based, were not made because of the balance sheet issues, but because of accounting irregularities that led to the charge that Caruana had embezzled money from TMI (id. at 37-38; Docket Entry No. 321-11 at 46-47), and because of what had been demonstrated over a period of months to be Caruana's poor budget control, inability to meet financial goals, commingling of personal and business

affairs, and general inability to manage the staff effectively. (Docket Entry No. 321-11 at 46-48) In short, Marcum testified that the TMI stock offering and recapitalization, embodied by the PPM and the earlier contractual provisions incorporated thereby, was not going to be undone by mere "issues of reps and warrants" for which restitution could be had from Caruana through other means. (Docket Entry No. 321-12 at 37-38, 40) It is unavailing to argue now that Caruana's breach of such representations and warranties forecloses any claim that Marcum and TMI breached their own promises made to induce the surrender of Caruana's 100% stock certificate. Summary judgment is not proper on this claim.

Likewise, the triable issues of whether the Southern GM defendants may have defrauded Caruana and/or breached their contractual duties to him compel the denial of summary judgment with regard to the claimed breaches of fiduciary duty. As noted by defendants, the oppressive conduct which, under Tennessee law, places a corporation's officers, directors, and/or majority shareholders in breach of their fiduciary duties to a minority shareholder is, e.g., "conduct whereby the majority attempts to freeze or squeeze the minority shareholder(s) out of the business, depriving the minority of its right to participate in the management of the corporation and/or their right to benefit financially in the form of reasonable compensation or dividends." Cochran v. L.V.R. & R.C., Inc., 2005 WL 2217067, at *5 (Tenn. Ct. App. Sept. 12, 2005). "Whether the majority or controlling shareholders have engaged in oppressive conduct is a fact intensive inquiry requiring an examination of the objectively reasonable expectations of the complaining shareholder and the actions of the defendants measured in terms of their fiduciary duties and in light of the totality of the circumstances." Id. "In order to withstand a motion for summary judgment, allegations that the fiduciary duty [owed between officers, directors and shareholders of a

closely held corporation] has been violated must be supported by material evidence that the action was not in the perceived best interests of the corporation and further that it was motivated by malice, avarice, or self-interest." Nelson v. Martin, 958 S.W.2d 643, 650-51 (Tenn. 1997), overruled on other grounds by Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691 (Tenn. 2002).

The motives for defendants' actions toward Caruana shortly after the consummation of the stock transaction are squarely at issue in light of, e.g., Marcum's testimony that Caruana was suspended due to the auditor's report of accounting irregularities revealing embezzlement, versus the testimony of the auditor, Mr. Bricken, that those irregularities did not necessarily reveal any such wrongdoing. (Docket Entry No. 337 at 30, 39, 42, 46-47, 50-51, 52) Considering this material factual issue as to the controlling shareholders' motives, and the evidence that they had regarded Caruana as the corporation's most vital asset (Docket Entry No. 321-11 at 47), a sufficient showing has been made that Caruana's removal was not in the perceived best interest of the corporation, but was motivated by the personal interests of the other shareholders, such that trial on the issue of breach of fiduciary duty is required.

### 4. Failure to Indemnify and Failure to Deliver Personal Property

In Caruana's revised amended complaint, it is alleged that TMI failed to indemnify and hold him harmless from all claims against him in a lawsuit filed by Marcum against Caruana in Bedford County Circuit Court on September 5, 2001. (Docket Entry No. 104 at ¶¶ 200-204) The basis for this claim is the August 20, 2001 amendment to TMI's corporate charter, which reads as follows:

Tennessee Motors, Inc., hereby covenants and agrees that it will hold harmless

and indemnify all officers, directors and shareholders from and against any and all claims and lawsuits against the corporation and said officers, directors and shareholders, provided that the corporation may not indemnify any officer, director or shareholder (a) in connection with a proceeding by or in the right of the corporation in which the officer, director or shareholder was adjudged liable to the corporation; or (b) in connection with any other proceeding charging improper personal benefit to the officer, director or shareholder, whether or not involving action in the officer, director or shareholder's official capacity, in which the officer, director, or shareholder was adjudged liable on the basis that personal benefit was improperly received.

TMI has moved for summary judgment on this claim based on a general denial of such liability arising from the state court suit by Marcum, individually, against Caruana, individually. In response, Caruana merely argues that TMI has not produced any evidence to support its argument for summary judgment on this claim. The undersigned presumes that the state court suit at issue here is the action referenced in Marcum's deposition, filed to recover for Caruana's alleged breach of his representations and warranties. Neither side has produced any information on this summary judgment record relating to the specific claims at issue in the state court proceeding, or to its disposition.

Similarly, Caruana claims that since March 29, 2001, TMI has tortiously refused to allow him to remove a boat, motor, trailer, and associated accessories from the company property where they had been stored since 1997, despite the alleged corporate distribution of this property to Caruana personally in 1997. (Docket Entry No. 104 at ¶¶ 183-199) TMI moves for summary judgment on this claim with the general argument that the claim has no merit, as there is no admissible evidence that Caruana purchased the boat with his personal money or paid any taxes in relation to the boat. In response, Caruana again cites TMI's failure to produce any evidence in support of its summary judgment argument.

As with the indemnity claim, there is no assertion of pertinent material facts not in dispute by either party.  (See Docket Entry No. 336)

Despite the underdeveloped summary judgment record and the vast unhelpfulness of the parties' briefs on these points, the undersigned finds that the claim of failure to indemnify Caruana for his expenses related to separate state court litigation commenced in September 2001, and the claim of conversion of a boat and related items, are not within the supplemental jurisdiction of this court to hear, inasmuch as they do not share a common nucleus of operative fact with the previously dismissed or settled federal claims alleging securities, antitrust, and other statutory violations occurring in the course of events which culminated with Caruana's ouster as manager of TMI.  Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  This statute codified the principles set forth in United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966), wherein the Supreme Court held that jurisdiction over a pendent state law claim is proper only when that claim and the federal claim(s) over which the court has original jurisdiction "derive from a common nucleus of operative fact," and are so closely related that the plaintiff "would ordinarily be expected to try all of them in one judicial proceeding."  Gibbs, 383 U.S. at 725.  Claims may derive from a common set of facts in a "broad, but-for, causal sense," without sharing the same *operative* facts, such that the federal claims may be resolved without considering the facts underlying the state law claims, and vice versa; in such instances, supplemental jurisdiction over the state law claims is lacking.  Parsons v. Heebsh, 2010 WL 3905196, at *7

(E.D. Mich. Sept. 30, 2010) (citing, e.g., <u>Salei v. Boardwalk Regency Corp.</u>, 913 F.Supp. 993, 998 (E.D. Mich. 1996)).

       In the case at bar, the claim for failure to deliver personal property may be resolved without considering the facts underlying the federal claims. The same is true of the failure to indemnify claim, which implicates a series of state statutes within the Tennessee Business Corporation Act, Tenn. Code Ann. § 48-18-501 <u>et</u> <u>seq.</u>, including a provision for court ordered indemnification wherein the filing with the court adjudicating the underlying controversy of an "application," rather than a civil complaint, for such relief is contemplated. Tenn. Code Ann. § 48-18-505. Neither of these claims would be expected to be resolved in the same judicial proceeding as the aforementioned federal claims asserted in this lawsuit, as they do not derive from a common set of operative facts, but only share a "broad, but-for, causal" derivation as matters also contested by parties who have had a serious falling out. The continued exercise of supplemental jurisdiction over these claims is thus improper.

       5. Claims Asserted by Diane Fitch

       Although Diane Janine Fitch is named as a plaintiff in the revised amended complaint, her name is scarcely mentioned outside of the caption of that document. None of the claims asserted therein are pressed in her name, with only the claim of failure to deliver personal property being stated in terms of harm to "Plaintiffs;" all other claims and harms are alleged in Caruana's name. In response to defendants' argument that Fitch should be dismissed from the lawsuit, Caruana argues that "Diane [Fitch] Caruana was wrongfully accused of financial impropriety even in the instant Motion for Summary Judgment[,]" apparently contending that she was defamed along with Caruana in statements to unnamed third parties, and before the TMI Board of Directors. (Docket Entry No. 335 at 11)

Inasmuch as the undersigned has concluded that Caruana's claims of defamation and failure

to deliver personal property should be dismissed, it would appear that there remains no

claim for which Fitch could recover.  It is therefore recommended that plaintiff Fitch be

dismissed from this lawsuit.


C.  <u>Motion of Defendant Ray</u>

Ray contends that the claims of fraud, conspiracy/concert of action, and

breach of fiduciary duty[2] against him should be subject to summary dismissal.  However,

incorporating the foregoing discussion of these claims as against the Southern GM

defendants, the undersigned finds that genuine issues of material fact pertaining to these

claims require that they be tried against defendant Ray as well.

Particular to Ray, the proof of record also details his involvement in Caruana's

dealings with Caldwell as a precursor to the entry of Marcum, et al. into the fray.  In short,

Caldwell had money on the table under an agreement to buy Caruana out of TMI, but

concerns over Caldwell's ability to make good on his full financial pledge and pressure to

avoid GMAC's withdrawal of TMI's credit line motivated Caruana to reject the deal with

Caldwell and instead seek Marcum's investment of capital.  Ray's version of his involvement

with this transaction includes only the giving of general advice to Caruana to do what was

---

[2]Ray repeats his argument that he cannot be liable for breaching any duty owed as an officer,
director, or majority shareholder of the corporation, inasmuch as he has never held any such
distinction.  (Docket Entry No. 371 at 15)  However, the Court has already rejected this contention as
unpersuasive, noting that "[s]hareholders acting collectively and constituting a controlling force in a
close corporation have a fiduciary duty to the remaining shareholders and must not act out of avarice,
malice, or self-interest."  (Docket Entry No. 102 at 35) (citing, e.g., <u>Nelson v. Martin</u>, 958 S.W.2d at
648).

necessary to preserve TMI's credit with GMAC, and thus the health of his business. However, Caruana maintains that Ray acted authoritatively in directing Caruana to seize the opportunity to reject Caldwell's offering of a $175,000.00 cashier's check after Caldwell had breached their agreement when his personal checks had failed to clear, and to deal with Marcum instead. In essence, Caruana's position and proof is that Ray shepherded the business away from Caldwell's curative attempt to purchase the dealership and real estate, and toward the recapitalization plan of the Marcum group that Ray intended to join as an investor, without fully disclosing the extent of his business relationship with Marcum, while Ray submits that all such decisions were made by Caruana without undue influence or incomplete disclosure by Ray, and in the best interest of TMI to boot. Although Ray relies upon the multiple written waivers of any conflict of interest arising from Ray's representation of both Caruana and Marcum, there appears to be an issue as to whether such conflict waivers which were executed prior to the issuance of the PPM were effective in light of Caruana's ignorance of Ray's potential financial interest in a Marcum-lead bid. A review of Ray's Statement of Undisputed Facts and Caruana's responses thereto, as well as Caruana's additional statement of facts in dispute and Ray's responses thereto (Docket Entry Nos. 338 & 361), reveal some dispute at nearly every turn of their respective positions, as do the competing expert reports filed by the parties in support of their positions on Caruana's claim of Ray's legal malpractice (Docket Entry Nos. 321-20 & 321-21). While Ray argues that, with respect to the legal malpractice claim, Caruana has failed to establish any resulting harm by showing "that at the end of the day, he would have been better off if he had not done the Marcum deal" (Docket Entry No. 374 at 4) but had instead pursued the contract he had secured with Caldwell (and on which Caldwell subsequently sued Caruana and TMI),

the undersigned believes that a reasonable jury could find otherwise from the proof as it must be considered at this summary judgment stage.

In short, considering the host of depositions, affidavits, and documentary evidence on this record in the light most favorable to Caruana, Caruana's fraud, conspiracy/concert of action, and breach of fiduciary duty claims must be tried against defendant Ray, as well as against the other defendants with whom he is alleged to have conspired. With genuine factual issues requiring trial over Ray's liability for fraud and conspiracy to defraud during a period of time when he was representing Caruana, the summary judgment Ray seeks on Caruana's claim of legal malpractice must likewise be denied. Considering the totality of the circumstances of Ray's involvement with Caruana and Marcum, the case against him simply is not suited for summary judgment. Cf. generally Hager v. Fitzgerald, 934 S.W.2d 668, 671 (Tenn. Ct. App. 1996).

While Ray also seeks summary dismissal of Caruana's claim under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, the undersigned does not construe the revised amended complaint to allege such statutory violation by Ray, but rather by GM and GMAC only. Although the alleged violation is leveled against "GM and GMAC, with the other Defendants herein," the underlying wrongful conduct is alleged to be "retaliation [for] using invoice price selling," an accusation never made against the individual defendants or TMI. Consequently, this claim appears to have been compromised and settled with the stipulated dismissals of GM (Docket Entry No. 306) and GMAC (Docket Entry No. 310) from the lawsuit, and thus is no longer an issue in the case.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that the Southern GM defendants' motion for summary judgment be GRANTED in part and DENIED in part. The motion should be granted as to Caruana's claims of defamation, false light invasion of privacy, failure to indemnify, and failure to deliver personal property, and as to the claims of Diane Fitch; it should be DENIED as to Caruana's claims of fraud, breach of contract, breach of fiduciary duty, conspiracy, and concert of action.

The Magistrate Judge further recommends that Defendant Ray's motion for summary judgment be DENIED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 21st day of July, 2011.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE