UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PAUL F. CARUANA | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 3:01-cv-1567 |
| v. | ) Judge Sharp |
| | ) |
| DAN J. MARCUM, et al. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

For a few years in the late 1990's and early 2000's, Defendant Donald J. Ray was Plaintiff Paul F. Caruana's lawyer. (Docket No. 402-1, p. 8.) Caruana sued Ray, claiming that Ray violated his fiduciary duty and breached his contract to represent Caruana. (Docket No. 402-1, pp. 28–31.) Ray has moved to dismiss the claims and to strike Caruana's supplemental discovery responses. (Docket Nos. 535, 577.) The two Motions concern the same basic issue—whether Caruana tried to change his theory of damages after discovery ended.

The Court will deny both Motions.

## BACKGROUND

### I. Factual Background

From July 1993 until March 2001, Caruana owned TMI, a General Motors ("GM") dealership in Shelbyville, Tennessee. (Docket No. 386, p. 2.) TMI was incorporated under Tennessee law and did business as "Southern GM."[1] General Motors Acceptance Corporation ("GMAC") provided floor financing for TMI. (Docket No. 386, p. 2.)

---
[1] For clarity, the Court will refer to Southern GM as "TMI" throughout this Memorandum.

In September 1998, Caruana discovered that TMI's comptroller had misappropriated corporate funds and erased data from corporate computers. As a result of the incident, TMI was out of trust with GMAC for about $450,000. (Docket No. 386, pp. 2–3.)

In November 1999, GMAC demanded that TMI put $275,000 into the corporation. Caruana could not pay the $275,000, so he began looking for potential purchasers or investors. (Docket No. 386, p. 3.) Ray, Caruana's lawyer, introduced Caruana to Dan J. Marcum and Joe E. Lester. (Ray had represented Marcum in the past.) Caruana asked Marcum and Lester to invest in TMI. Both said no. (Docket No. 386, p. 3.)

However, Caruana soon found a buyer. That buyer, Gene Caldwell, agreed to pay $750,000 to Caruana and an initial $250,000 capital contribution to GMAC; in exchange, Caldwell received operating control and a 50% interest in TMI. GMAC approved the sale soon after the agreement. (Docket No. 386, p. 3.) Caldwell, who had effectively bought Caruana out, was now responsible for making the capital contributions that GMAC had demanded. (Docket No. 386, p. 3.)

In April or May 2000, two of Caldwell's checks bounced. Caldwell asked for more time to come up with the money. Meanwhile, GMAC continued to demand payment and threatened to pull TMI's credit line altogether if Caldwell failed to pay. (Docket No. 386, p. 3.)

By now, Marcum had reconsidered his earlier decision. He reached out to Caruana about investing in TMI, and the two met to discuss the details. Ray was also at the meeting; he reminded both Caruana and Marcum of the potential conflict of interest that might arise from his representing TMI, Caruana, and Marcum in the past. Neither Caruana nor Marcum objected to Ray's role. (Docket No. 386, p. 4.)

2

Marcum and Caruana eventually reached a tentative deal: Marcum would invest $175,000 in TMI immediately and pay another $100,000 later. Marcum and Caruana then continued to discuss the terms of the investment after the first two payments. (Docket No. 386, p. 4.)

After the negotiations ended, Ray wrote up the parties' agreement in a document known as the Stock Option Purchase Agreement. (Docket No. 458-1.) That agreement gave Marcum the option to buy 50% of Caruana's stock in TMI, while Caruana retained 50% ownership and control of the dealership. The agreement also included a provision that disclosed Ray's conflict of interest. The parties signed the agreement on August 3, 2000. (Docket No. 386, pp. 4, 23.)

They signed another contract, known as the Transaction Summary Agreement, in December 2000. (Docket No. 352-4.) Under the terms of that agreement, Marcum would underwrite an additional capital injection into TMI in the form of additional common stock. The common-stock issuance diluted Caruana's ownership interest, lowering it from 50% to 30%. (Docket No. 386, pp. 4–5.) The agreement also provided that Caruana would remain an employee of the dealership. (Docket No. 386, p. 5.)

Over the course of February 2001, TMI received checks and subscription agreements from Marcum, Carl Hyde, A.P. Bass, and Lester, all of whom became part owners in the dealership and, in some cases, members of the Board of Directors. Ray invested $10,000 in TMI in exchange for a 1.47% stake of the corporation's stock, but he was never made an officer or director of the corporation. (Docket No. 386, p. 5.)

TMI hired an independent auditor on February 6, 2001, and the auditor presented its results to Marcum the next month. Around the same time, GM approved new investors in the corporation, and the investment capital was released from escrow. Once the money was

released, the corporation's Executive Committee and Board of Directors decided to fire Caruana. On March 29, 2001, Caruana was escorted from the dealership by armed off-duty police officers.[2] (Docket No. 386, p. 5.)

**II. Procedural History**

This case has been vigorously litigated for fifteen years, so the Court will focus only on the small part of the docket relevant to this motion.

Caruana filed this suit in December 2001. (See Docket No. 1.) Against Ray, Caruana brought claims for breach his professional duty to Caruana and for breach of his agreement to represent Caruana. (Docket No. 402-1, pp. 28–31.)

Caruana sent Ray his initial disclosures on May 6, 2002. (Docket No. 536-1.) In that document, Caruana offered a "compilation of damages" that consisted of lost TMI stock value, lost salary, lost employment benefits, and a few other items. (Docket No. 536-1, pp. 3–4.)

Caruana then enlisted Dr. Stanley P. Stephenson to provide expert testimony on his economic damages. (See Docket No. 308-2.) Caruana disclosed Stephenson's expert report on February 9, 2009. On September 10, 2012, Ray moved to exclude Stephenson's report. (See Docket No. 429.) Caruana never responded to the motion.

Caruana filed his trial brief, interrogatory answers, and potential witness list on May 20, 2015. (Docket Nos. 510-1, 513, 515.) He stated that his alleged damages would consist of "[r]eturn of stock in TMI plus diminishment in value of stock," the "value of the stock of which [he] was defrauded," the "lost income [he] suffered and the amount of out of pocket expenses," and punitive damages. (Docket No. 510-1, pp. 5–6.) Caruana added that "[e]xperts will be needed to evaluate the dollar amount of loss and real losses continuing to accrue." However,

---

[2] Caruana remained a TMI shareholder and continued to receive paychecks from TMI through June 2001. (Docket No. 386, p. 5.)

4

Stephenson was not listed as a potential witness in the pretrial witness list. (Docket No. 510-1, p. 6; Docket No. 513.)

In his trial brief, Caruana was more specific. He estimated that his total damages would be "between $7,216,000 and $8,250,000." (Docket No. 515, p. 4.) These damages were divided broadly: Caruana listed compensatory damages and punitive damages for each claim, along with prejudgment interest and benefit received. (Docket No. 515, p. 4.)

Ray moved to dismiss Caruana's claims on May 26, 2015. (Docket No. 535.) Defendant argued that, in failing to specifically identify the amount of damages attributable to Ray himself, Caruana did not allege a fundamental element of his claims. (Docket No. 536, p. 3.) Plaintiff filed a response, contending that he "ha[d] fully disclosed his damages" to Ray in his May 2002 initial disclosures. (Docket No. 555, p. 7.)

At the pretrial conference on May 29, 2015, Caruana's counsel told the Court that Caruana would no longer rely on Stephenson's testimony for his damages calculation. (Docket No. 567, p. 18.) Counsel said that, though Stephenson was no longer going to testify, "[t]he elements of [Caruana's] calculation of damages has never changed." (Docket No. 567, p. 18.) Counsel then pointed out that Caruana himself had testified in his deposition on each item that would make up the damages calculation. In all, Caruana's counsel said, "Ray certainly [knew] what the damages calculation would have been." (Docket No. 567, p. 19.)

The Court asked Caruana to submit supplemental briefing on the issue. Specifically, the Court urged Caruana's counsel to point to the sections of Caruana's deposition in which Caruana discussed TMI's valuation; that way, the Court reasoned, both parties would be sure that Ray would have known that Caruana had a basis for showing damages without Stephenson's testimony. Both parties submitted supplemental briefs and replies. (Docket Nos. 570, 574, 579,

581.) Caruana also submitted Supplemental Discovery Responses (Docket No. 573-1), which include a detailed computation of each category of damages. Ray moved to strike the Responses. (Docket No. 577.)

## ANALYSIS

The issue for the Court is fairly straightforward: whether Caruana complied with discovery rules by disclosing the basis for his damages claim. If not, Rule 37(c) might prevent Caruana from proving damages at trial. See FED. R. CIV. P. 37(c)(1). But if Caruana satisfied Rule 26(a), then Ray's motion fails.

Ray has moved to Strike Caruana's Supplemental Discovery Responses, which set out a calculation of the damages that Caruana seeks. The Court will first address that Motion, then will turn to Ray's Motion to Dismiss.

### A. Motion to Strike

Under Rule 26(e) of the Federal Rules of Civil Procedure, a party "must supplement or correct" an interrogatory answer if the previous answer was "incomplete or incorrect," or if the court had ordered the party to supplement the answer. FED. R. CIV. P. 26(e)(1)–(2). Still, Rule 26(e) "does not give license to sandbag one's opponent" with new information that should have been disclosed earlier. Beller v. Beller ex rel. U.S., 221 F.R.D. 696, 701 (D.N.M. 2003). In such instances, Rule 37(c)(1) allows courts to exclude the new information, unless non-disclosure was justified or harmless. FED. R. CIV. P. 37(c)(1). Exclusion of evidence may be appropriate when a party fails to make proper disclosures under Rule 26. Caudell v. City of Loveland, 226 F. App'x 479, 481, n.1 (6th Cir. 2007); Harville v. Vanderbilt Univ., 95 F. App'x 479, 719, 725 (6th Cir. 2003).

Caruana filed his Supplemental Discovery Responses on June 22, 2015. (Docket No. 573-1.) The Supplemental Responses include a brief explanatory paragraph and a two-page table showing an itemized calculation of damages. (Docket No. 573-1, pp. 1–3.) Each entry on the table represents a source of the damages calculation: TMI's total value, the land's value, the value of Caruana's lost stock options, Caruana's salary, and severance. (Docket No. 573-1, pp. 2–3.)

In support of his Motion, Ray argues that the Supplemental Responses are "not truly 'supplementation,' but are instead an improper attempt to change [Caruana's] entire theory of damages." (Docket No. 578, p. 1.) But this argument misses the mark. When the Supplemental Responses are compared to Caruana's original Response, it seems clear that Caruana was not trying to advance a new theory. Instead, his supplementation simply added detail to the theory that he had already put forward.

In his original Response to Ray's Interrogatories, Caruana had said that his damages would consist of "[r]eturn of stock in TMI plus diminishment in value of the stock [and] lost income," or "the value of stock of which [he] was defrauded," plus "out of pocket expenses" and punitive damages. (Docket No. 573-1, p. 1.)

He gives a similar breakdown of damages in his Supplemental Responses:

I seek total damages and interest between $4,887,838.30 and $7,100,338.30 plus the benefit the defendants received in an amount to be determined. Damages are based on the amounts stated in the contracts between the parties and/or as determined by arms-length transactions contemporaneous with the events in this suit. *The basic damages are the value of TMI plus interest before the contract of the value of my interest in TMI plus employment and other terms plus interest and fees and costs in both cases*.

(Docket No. 573-1, p. 2 (emphasis added).)

7

Read together, the original Response and the Supplemental Response say essentially the same thing: Caruana seeks the value of his lost stock in TMI, along with his salary and other lost employment benefits, plus fees and interest. And though the Supplemental Response adds specificity to that damages calculation, it does not fundamentally alter the damages theory itself. Thus, the Supplemental Response did not harm Ray. See, e.g., KCH Servs. Inc, v. Venaire, Inc., No. 05-777-C, 2010 WL 1416672, at *3 (W.D. Ky. Mar. 31, 2010) (finding that plaintiff's supplemental expert report did not harm the defendant when the report "did not fundamentally change [the] method of calculating damages"). And without any harm to Ray, Rule 37 sanctions would be inappropriate. FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . *unless the failure was substantially justified or is harmless*.") (emphasis added).

In fact, the circumstances here are distinct from those in which courts usually impose Rule 37 sanctions for Rule 26(e) violations. In those cases, a party often fails to present a coherent theory of damages, then later attempts to add new theories through Rule 26(e) supplementation. See, e.g., Oceans Cuisine, Ltd. v. Fishery Prods. Int'l, Inc., No. 05-CV-3613, 2006 WL 1071578, at *5 (E.D.N.Y. Apr. 21, 2006) (holding that a plaintiff could not use supplemental interrogatory responses to assert novel theory of damages, where plaintiff "belatedly consulted with . . . an advertising company, and later attempted to assert damages theories based upon that consultation"); Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp., No. 04 Civ. 3854 RCCAJP, 2005 WL 977850, at *2 (S.D.N.Y. Apr. 28, 2005) (precluding evidence of currency-conversion damages claim that plaintiff included in supplemental discovery when that claim had never been mentioned in prior disclosures); Gilvin v. Fire, No. 99-CV-530, 2002 WL 32170943, at *3 D.D.C. Aug. 16, 2002) ("At no time prior to

8

filing the Pretrial Statement did Plaintiff identify any actual damages on [travel reimbursements], let alone provide a computation of such damages in accordance with Fed. R. Civ. P. 26(a)(1)(C).").

This case is very different: Caruana had already offered a theory of damages, and his Supplemental Responses merely "fill[ed] . . . [the] interstices" of that theory. Munchkin, Inc. v. Playtex Prods., LLC, 600 Fed. App'x 537, 538 (9th Cir. 2015). There is no reason to strike Caruana's Supplemental Discovery Responses. Accordingly, Ray's Motion fails.[3]

### B. Motion to Dismiss

In support of his Motion to Dismiss, Ray argues that Caruana never disclosed the damages theory that he intends to use at trial. Specifically, he notes that Caruana had originally intended to use Stephenson's expert testimony to prove damages to the jury, but later decided to rely on his own testimony to prove his damages. Ray argues that, although Caruana submitted a new calculation of damages in his May 20, 2015 brief, that calculation had never been disclosed during discovery. He urges dismissal as a sanction for Caruana's failure to comply with discovery rules. (Docket No. 574, pp. 1–2.)

In response, Caruana argues that he had disclosed the basis of his damages to Ray long before pretrial briefs were due. Even without Stephenson's testimony, Caruana contends, Ray had "ample opportunity to explore the various details of the Caldwell deal and the stock purchase," both of which form the basis of Caruana's damages theory. (Docket No. 570, p. 10.)

---

[3] Ray also argues that the Supplemental Responses were untimely. (Docket No. 578, p. 1.) But this ignores the fact that the Court instructed Caruana to provide more information on damages after the discovery deadline had passed. During the May 29, 2015 pretrial conference, Caruana's counsel told the Court that Caruana had been asked about each item that figured into his damages calculation; the parties needed only to "add all of the numbers up and present them on a silver platter, a final number." (Docket No. 567, p. 58.) The Court then told Caruana to "go back through" the deposition transcripts and file another brief discussing damages, and to "supplement it, and tell [the Court] all the places" where Caruana testified about the sources the damages calculation. (Docket No. 567, p. 58.) In light of this exchange—and the Court's clear request for more information on Caruana's damages calculation—it would seem unfair for the Court to penalize Caruana for filing after the discovery deadline.

The Court agrees with Caruana. Under Rule 26(a)(1)(A)(iii), a party seeking damages must submit:

> "a computation of each category of damages claimed by the disclosing party," as well as "documents or other evidentiary material, . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered."

FED. R. CIV. P. 26(a)(1)(A)(iii).

Essentially, Rule 26(a)(1)(A)(iii) contains two separate requirements: a computation of the damages sought, and disclosure of the materials underlying the computation. Bridgestone Ams., Inc. v. Int'l Bus. Machs. Corp., No. 3:13-cv-1196, 2016 WL 3211226, at *2 (M.D. Tenn. Jan. 12, 2016).

Caruana has satisfied both requirements. First, he provided his damages calculation in his Supplemental Responses (Docket No. 573-1), which the Court has declined to strike from the record. This meets Rule 26(a)'s calculation requirement, since a party is free to satisfy 26(a)'s requirements through supplemental disclosures filed later. Design Strategy, Inc. v. Davis, 469 F.3d 284, 295 (2d Cir. 2006) (noting that Rule 26(a) contemplates that parties file supplemental disclosures with ever-greater level of detail as discovery progresses); City & Cty. of S.F. v. Tutor-Saliba Corp., 218 F.R.D. 219, 222 (N.D. Cal. Oct. 2, 2003). ("So long as Plaintiffs timely fulfill their disclosure obligations, they will not be prejudiced for making initial disclosures that are revised.").

Second, Caruana has shown that he had already disclosed evidence for each category of damages listed in his calculation. Other courts have found that a party can satisfy Rule 26(a)'s disclosure requirements by pointing to materials or testimony that bears on a category of damages sought. See, e.g., Frontline Med. Assocs., Inc. v. Coventry Health Care, 263 F.R.D. 567, 569–70 (C.D. Cal. 2009) (noting that a party would have satisfied Rule 26(a) by disclosing

both supporting documents and a computation of damages, supported by those documents); Reyes v. City of Glendale, No. CV 05-0253 CAS (MANx), 2009 WL 2579614, at *6 (C.D. Cal. Aug. 16, 2009) (finding that plaintiff "sufficiently demonstrated that he has adequately disclosed evidence regarding damages to defendants" through his deposition testimony and responses to interrogatories); Pine Ridge Recycling, Inc. v. Butts Cty., Ga., 889 F. Supp. 1526, 157 (M.D. Ga. 1995) (finding that plaintiffs met 26(a)'s damages-calculation-disclosure requirement when plaintiff could identify distinct categories of damages and voluminous evidence regarding damages had been presented at hearing).

Here, every category of damages listed in Caruana's damages calculation was either discussed in depositions or disclosed in documents to Ray.

### 1. TMI Value

In his Supplemental Discovery Responses, he calculates that TMI was worth $680,000 when he was the full owner, and worth between $1.5 million and $2 million after the Marcum deal. (Docket No. 573-1, p. 3.) He also calculates that TMI's net value, for his purposes, is between $562,500 and $750,000. (Docket No. 573-1, p. 3.) That calculation is based on 37.5% share of TMI stock, which he alleges was promised to him as part of his deal with Marcum. (Docket No. 573-1, p. 3.)

Those numbers find support in the deposition and discovery materials. In his deposition, Caruana testified about the December 2000 Transaction Summary Agreement. (570-9, p. 21.) That agreement provided that "[TMI] has an enterprise value of $680,000" and that "Caruana will own approximately 37.5% of the common stock" in TMI. (Docket No. 352-4, p. 1.) Additionally, Caruana testified about an outline of events that he produced in 2001; that outline forms the basis of his calculation of TMI's value after 26 months. (Docket No. 570-9, pp. 42–

43.) According to that outline, Marcum had agreed in June 2000 to sell the dealership "within 6–26 months," ideally for a price "between $1,500,000 and $2,000,000." (Docket No. 570-7, p. 2.)

### 2. Land Value

Caruana's Supplemental Discovery Responses also list the value of the land that he owned on Highway 231. (Docket No. 573-1, p. 3.) He calculated that the land was worth between $560,000 and $600,000. (Docket No. 573-1, p. 3.)

Caruana testified about the land in his deposition, explaining that it had become more valuable because of changes in zoning ordinances and new roads in the area. (Docket No. 570-8, pp. 31–32.) In his outline of events, he wrote that Caldwell had "agree[d] to buy . . . real estate on [Highway] 231 for $560,000.00." (Docket No. 570-7, p. 1.) The land was also part of the Transaction Summary Agreement, which required Caruana to seek a buyer for the land "with a target selling price of $600,000." (Docket No. 352-4, p. 2.)

### 3. Salary and Severance Pay

Caruana's Supplemental Discovery Response lists $360,000 in lost salary and severance pay. (Docket No. 573-1, p. 2–3.) Specifically, he states that he "would have earned $240,000 in salary if defendants had kept their promises instead of immediately firing [him]," and should have also received "$10,000 / month for 12 months" in severance pay after being ousted. (Docket No. 573-1, p. 3.)

Both figures appear in documents that had been disclosed during discovery. The Stock Option Purchase Agreement states that "Caruana agree[d] to be employed [as TMI's CEO and COO] for at least one year," with an understanding that the parties "w[ould] negotiate in good faith toward an extended employment contract." (Docket No. 458-1, p. 2.) The Agreement also states that the first year of employment would include "a minimum guaranteed salary of $10,000

per month, with benefits." (Docket No. 458-1, p. 2.)  And the Transaction Summary Agreement mentions Caruana's severance pay.  Paragraph 8 of that Agreement states that TMI would "negotiate a severance and non-compete plan for the [TMI] President/CEO, to include 12 months salary for severance resulting from a change in ownership." (Docket No. 352-4, p. 1.)

As mentioned earlier, Ray clearly had access to the Stock Option Purchase Agreement and the Transaction Summary Agreement throughout discovery.  Indeed, Ray's attorneys asked Caruana about both documents during Caruana's deposition.  (See Docket No. 570-9, pp. 19, 21.)

### 4. Stock Option Incentive

Caruana's Supplemental Discovery Response lists a "Stock Option Incentive" valued at "10% of [TMI's] value," or between $150,000 and $200,000.  (Docket No. 573-1, p. 3.)

The basis for that calculation comes from a few places.  Paragraph 7 of the Transaction Summary Agreement states that Caruana and Marcum "agree[d] to establish an incentive stock option plan . . . with up to 10% being set aside for [TMI's] President/CEO." (Docket No. 352-4, p. 1.)  Under the terms of the Stock Option Purchase Agreement, Caruana was to be employed as TMI's CEO for at least a year.  (See Docket No. 458-1, p. 2.)  And according to Caruana's timeline of events, Marcum had aimed to sell the dealership for a price "between $1,500,000 and $2,000,000." (Docket No. 570-7, p. 2.)

### CONCLUSION

All told, the damages computation in Caruana's May 20, 2015 brief was not "a new theory and calculation of damages." (Docket No. 574, p. 6.)  Instead, it was consistent with Caruana's deposition testimony and with documents that both parties possessed.  Caruana has offered evidence for each category of damages he now seeks and, in doing so, has complied with

13

the requirements of Rule 26(a)(1)(A)(iii).  See, e.g., Reyes v. City of Glendale, No. CV 05-0253 CAS (MANx), 2009 WL 2579614, at *6 (C.D. Cal. Aug. 16, 2009).  Imposing any sanctions—let alone dismissal—would be improper.

Of course, today's ruling makes no determination on whether all of Caruana's evidence on damages would ultimately be admissible at trial.  FED. R. CIV. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."); FED. R. CIV. P. 26 advisory committee's note to 2015 amendment  ("Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.").  Ray is free to file a motion in limine to challenge the admissibility of that evidence.

The Court denies Ray's Motion to Strike (Docket No. 535) and Motion to Dismiss (Docket No. 577).  An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE